UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| G.D., a minor, by and through her parents and next friends, JEFFREY and MELISSA D., <br><br>Plaintiffs, <br><br>v. <br><br>SWAMPSCOTT PUBLIC SCHOOLS, and BUREAU OF SPECIAL EDUCATION APPEALS, <br><br>Defendants. | Civil Action No. 19-cv-10431-DJC |

## MEMORANDUM AND ORDER

**CASPER, J.**                                                                                              **June 23, 2020**

### I.     Introduction

Plaintiff minor G.D., by and through her parents and next friends, Jeffrey and Melissa D. ("Plaintiffs") initiated this lawsuit against Swampscott Public Schools ("Swampscott") and the Bureau of Special Education Appeals ("BSEA") (collectively, "Defendants") alleging that Swampscott failed to provide G.D. with a free and appropriate public education ("FAPE") as required pursuant to the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 et seq. ("IDEA"). D. 7. Plaintiffs now move for summary judgment. D. 49. Swampscott opposes the motion, D. 58, and has moved to strike the supplemental record filed by Plaintiffs. D. 56. For the following reasons, the Court DENIES Swampscott's motion to strike and DENIES Plaintiffs' motion for summary judgment.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| G.D., a minor, by and through her parents and next friends, JEFFREY and MELISSA D., <br><br>Plaintiffs, <br><br>v. <br><br>SWAMPSCOTT PUBLIC SCHOOLS, and BUREAU OF SPECIAL EDUCATION APPEALS, <br><br>Defendants. | Civil Action No. 19-cv-10431-DJC |

## MEMORANDUM AND ORDER

**CASPER, J.**                                                                                              **June 23, 2020**

### I.     Introduction

Plaintiff minor G.D., by and through her parents and next friends, Jeffrey and Melissa D. ("Plaintiffs") initiated this lawsuit against Swampscott Public Schools ("Swampscott") and the Bureau of Special Education Appeals ("BSEA") (collectively, "Defendants") alleging that Swampscott failed to provide G.D. with a free and appropriate public education ("FAPE") as required pursuant to the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 et seq. ("IDEA"). D. 7. Plaintiffs now move for summary judgment. D. 49. Swampscott opposes the motion, D. 58, and has moved to strike the supplemental record filed by Plaintiffs. D. 56. For the following reasons, the Court DENIES Swampscott's motion to strike and DENIES Plaintiffs' motion for summary judgment.

## II.     Standard of Review

"'[A] motion for summary judgment in an IDEA case is simply a vehicle for deciding the relevant issues[;] . . . the non-moving party is not entitled to the usual inferences in its favor and summary judgement is not precluded where there is a dispute as to issues of fact." Doe v. Richmond Consol. Sch. Dist., No. 15-cv-30027-MGM, 2016 WL 3064056, at *4 (D. Mass. May 31, 2016) (quoting Sebastian M. v. King Philip Reg'l School Dist., 685 F.3d 79, 84-85 (1st Cir. 2012)) (alterations in original).  The party challenging the BSEA officer's decision bears the burden of proof.  C.D. by & through M.D. v. Natick Pub. Sch. Dist., No. 15-cv-13617-FDS, 2017 WL 3122654, at *14 (D. Mass. July 21, 2017), aff'd, 924 F.3d 621 (1st Cir. 2019) (citing Hampton Sch. Dist. v. Dobrowolski, 976 F.2d 48, 54 (1st Cir. 1992)).

"Federal courts reviewing administrative determinations under the IDEA employ 'an intermediate standard of review' which 'requires a more critical appraisal of the agency determination than clear-error review entails, but which, nevertheless, falls well short of complete *de novo* review.'" Doe v. Marlborough Pub. Sch., No. 09-cv-11118-WGY, 2010 WL 2682433, at *4 (D. Mass. June 30, 2010) (quoting Lenn v. Portland Sch. Comm., 998 F.2d 1083, 1086 (1st Cir. 1993)).  The Court "must give 'due weight' to the administrative findings of fact, mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." Id. (quoting Burlington v. Dep't of Educ., 736 F.2d 773, 792 (1st Cir. 1984)).  Under the IDEA, reviewing courts "(i) shall receive the records of the administrative proceeding; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." Natick Pub. Sch. Dist., 2017 WL 3122654, at *1 (citing 20 U.S.C. § 1415(i)(2)(C)).

**III.     Factual Background**

The following facts are drawn from Plaintiffs' statement of material facts, D. 49-2, Swampscott's response to same, D. 59, the administrative record[1] and the supplemental record filed by Plaintiffs, D. 49-3.

G.D. is currently nine years old and was most recently enrolled at Landmark School ("Landmark"). D. 59 ¶¶ 1, 81. When she was seven years old, G.D. was diagnosed with "a significant language-based learning disability, encompassing 'double-deficit' dyslexia and dysgraphia as well as some related difficulties with expressive language." D. 59 ¶ 3. As a result, G.D.'s ability to learn to read, write and spell is significantly impaired. D. 59 ¶ 7. G.D. attended a private school for kindergarten and first grade, during which time she did not receive any special education services or a formal reading program. D. 59 SPS[2] ¶ 1; AR at 205.

Swampscott first evaluated G.D. in April and May of 2017 through psychological and educational assessments while she was still attending first grade at a private school. AR at 206. Swampscott's elementary team chair also observed G.D. during her class at the private school. AR at 207. Swampscott determined that G.D. was eligible for special education services and offered her summer services during the summer of 2017. AR at 226. In June 2017, Swampscott convened an initial meeting with G.D.'s parents to discuss an IEP for G.D. D. 59 SPS ¶ 6; AR at 208. At this first meeting, prior to delivery of services from Swampscott, G.D.'s parents expressed their belief that Swampscott could not provide a proper education and that G.D. should be placed in a private school for children with language-based disabilities. See D. 59 SPS ¶ 4; AR at 208. G.D.'s parents had G.D. privately evaluated by Dr. Richard Kemper ("Dr. Kemper") during the

---

[1] The administrative record will be cited hereinafter as "AR at [page number]."

[2] "SPS" refers to those paragraphs of Swampscott's response to Plaintiffs' statement of material facts in which they include additional facts.

summer of 2017, who opined that G.D. required placement in a private school. D. 59 SPS ¶ 8; AR at 209, 212. Between July 10 and August 2, 2017, G.D. attended two forty-five-minute sessions each week of special education reading services provided by Swampscott. AR at 209.

G.D. began second grade at Swampscott on or around August 29, 2017. AR at 212. During September 2017, Swampscott completed its evaluation of G.D. through additional assessments in the areas of speech/language, executive functioning, reading, and written language. AR at 213. Between September 2017 and January 2018, G.D. participated in a general education class at Swampscott with support for science, social studies and non-academic activities. AR at 227. She would then separate from the general education class to work on reading and writing skills in individual or small group sessions with a special education teacher. AR at 227. G.D.'s parents first filed a request for a hearing with the BSEA on September 26, 2017, less than a month after G.D. began second grade at Swampscott, seeking an order directing Swampscott to fund G.D.'s placement at a private school such as Landmark. AR at 215. G.D.'s parents withdrew this initial request without prejudice on December 5, 2017. AR at 215.

In mid-November of 2017, after G.D.'s parents and Dr. Kemper raised concerns about G.D.'s progress, Swampscott adjusted G.D.'s IEP such that she would receive more intensive services through Swampscott's Language Based Learning Center ("LBLC"). AR at 216, 227. In January 2017, G.D. began participating in the LBLC for literacy-related instruction and math. AR at 227. She continued to participate in the general education class for other subjects and was also provided speech/language therapy weekly. AR at 227. The LBLC classroom had seven students, of which G.D. was the only second-grade student. AR at 217. All of the other students had language-based learning disabilities affecting reading and/or written expression and none of the

students had behavioral issues. AR at 217. Both G.D.'s general education and special education teachers described G.D. as an active, engaged and enthusiastic student. AR at 218.

The June 2017 IEP meeting was the first of five convened by Swampscott during the 2017-2018 school year to discuss concerns regarding G.D.'s education and progress with G.D.'s parents. D. 59 SPS ¶ 6. During each of these meetings, Swampscott adjusted the services offered to G.D. based on additional evaluations and information learned through G.D.'s participation in the second grade at Swampscott. See D. 59 SPS ¶ 6. G.D.'s parents conditionally accepted each of the IEPs developed for G.D. to facilitate delivery of services, but rejected the suitability of the services and reiterated that G.D. should be enrolled at a private language school at Swampscott's expense. See D. 59 SPS ¶ 7; AR at 209, 222. Swampscott adopted almost all of the recommendations made by Dr. Kemper over the course of the school year, with the exception of his recommendation that G.D. be placed in a separate private school. AR at 226-27.

In March 2018, G.D. underwent formal and informal assessments of her progress at Swampscott. AR at 219. According to testing, G.D had increased her ability to name or identify consonant sounds, digraphs/trigraphs, vowel sounds, real words read, total nonsense words, spell real words, read sight words and spell sight words. AR at 219. Testing also indicated that G.D. had improved her oral reading fluency and was making progress in writing using graphic organizers, templates and word processing programs. AR at 219. G.D. had also improved from reading at a mid-kindergarten level when she entered Swampscott to reading at a first-grade level. AR at 228. In formal testing conducted by Dr. Kemper, G.D.'s scores were the same or slightly lower than previous tests. AR at 219. Dr. Kemper opined that G.D. had made no statistically significant progress at Swampscott. AR at 220. On March 9, 2018, Swampscott issued a progress report for G.D. indicating that she was making progress towards the goals in her IEP. AR at 221.

G.D.'s parents applied for G.D.'s admission at Landmark and, following evaluations, she was accepted to both the summer program and elementary school program on March 14, 2018. AR at 221-22. On March 20, 2018, the IEP team at Swampscott met with G.D.'s parents and Dr. Kemper. AR at 222. Dr. Kemper stated that he felt that G.D. had regressed while at Swampscott and required an outside placement, but Swampscott personnel stated that G.D. was progressing in the LBLC program and was functioning well socially at Swampscott. AR at 222. During this meeting, G.D.'s parents notified Swampscott that G.D. had been accepted to Landmark and indicated their intention to seek reimbursement for G.D.'s tuition from Swampscott. AR at 222. G.D. attended Landmark's summer program during the summer of 2018 and began attending Landmark's elementary school program in September 2018. AR at 223.

On March 30, 2018, G.D.'s parents filed a hearing request with the BSEA. AR at 203. G.D.'s parents alleged that the IEPs proposed by Swampscott and the corresponding placements were not reasonably calculated to provide G.D. with a FAPE and sought an order from the BSEA requiring Swampscott to reimburse them for expenses related to G.D.'s planned placement at Landmark. AR at 203. The hearing was held over the course of eight days in June, July and October of 2018. AR at 203. On December 10, 2018, the BSEA Hearing Officer (the "Hearing Officer") issued a decision noting that it was a "close case" and concluding that the IEPs and placements offered by Swampscott were reasonably calculated to provide G.D. with a FAPE and, thus, G.D.'s parents were not entitled to reimbursement for the costs associated with their unilateral placement of G.D. at Landmark. AR at 229. In so finding, the Hearing Officer did not reach the issue of whether Landmark was an appropriate placement for G.D. AR at 229.

**IV.  Procedural History**

Plaintiffs initiated this action on March 8, 2019, D. 1, and filed an amended complaint on April 3, 2019, D. 7. On October 2, 2019, the Court granted Plaintiffs' motion to supplement the

administrative record in part only to the extent of allowing Plaintiffs to submit documents as to G.D.'s progress at Landmark during the 2018 summer program and the 2018-19 school year up through the final date of the BSEA hearing on October 10, 2018.  D. 37.  Plaintiffs have now moved for summary judgment, D. 49, and Swampscott has moved to strike the supplemental record, D. 56.  The Court heard argument on the pending motions and took the matters under advisement.  D. 67.

## V.     Discussion

### A.     The IEP and FAPE Framework

The IDEA offers states federal funds to assist them in educating children with disabilities, while also requiring them to comply with certain statutory conditions in the delivery of that education.  Endrew F. v. Douglas Cty. Sch. Dist. RE-1, 137 S. Ct. 988, 993 (2017).  One of these requirements is that all eligible students must be provided with a FAPE.  Id.  "A FAPE encompasses special education and support services provided free of charge."  D.B. v. Esposito, 675 F.3d 26, 34 (1st Cir. 2012) (citing C.G. v. Five Town Cmty. Sch. Dist., 513 F.3d 279, 284 (2008)).  "A State covered by the IDEA must provide a disabled child with such special education and related services 'in conformity with the [child's] individualized education program,' or IEP."  Endrew, 137 S. Ct. at 994 (quoting 20 U.S.C. § 1401(9)(d)).

"Under [the IDEA], school systems must take steps to identify children who may qualify as disabled, evaluate each such child to determine his or her eligibility for statutory benefits, and develop a customized IEP designed to ensure that the child receives a level of educational benefits commensurate with a FAPE."  C.G., 513 F.3d at 285 (citing 20 U.S.C. §§ 1412(a)(3)-(4), 1414(a)-(b)).  "The IEP must include information about the child's disabilities, a statement of educational goals, a description of the measures that will be used to determine whether the child has met those goals, and a compendium of special education and related services that will be furnished to the

child."  Id.  "The IEP must also describe the 'special education and related services . . . that will be provided' so that the child may 'advance appropriately toward attaining the annual goals' and, when possible, 'be involved in and make progress in the general education curriculum.'"  Endrew, 137 S. Ct. at 994 (quoting 20 U.S.C. § 1414(d)(1)(A)(i)(IV)).

Although the IEP process is meant to be a collaborative effort between parents and school officials, where disagreements occur parents can turn to the dispute resolution procedures promulgated under IDEA.  See 20 U.S.C. § 1415.  When a school district finds that it is unable to provide a FAPE to a certain student, they may be required to fund the student's placement at a private school.  Richmond Consol. Sch. Dist., 2016 WL 3064056, at *4.  Parents may choose to place a student in a private school, however, "parents who unilaterally change their child's placement during the pendency of review proceedings, without the consent of state or local school officials, do so at their own financial risk."  Id. (citing School Comm. of Burlington v. Dep't of Educ., 471 U.S. 359, 373-74 (1985)).

### B. The Hearing Officer Did Not Err in Determining that Swampscott Offered G.D. a FAPE

Upon review of the administrative record, Plaintiffs have failed to meet their burden to show that the Hearing Officer erred in finding that the IEPs prepared by Swampscott provided G.D. a FAPE.  The BSEA held an evidentiary hearing regarding the IEPs provided by Swampscott and G.D.'s chosen placement at Landmark over eight days between June 6 and October 10, 2018.  AR at 203.  Over two hundred exhibits were submitted and both parties were represented by counsel and had the opportunity to examine and cross-examine witnesses.  Id.  Both parties also submitted written closing arguments following the hearings.  Id.

Plaintiffs argue that the BSEA Hearing Officer erred in finding that, based on the "slow gains" made by G.D. while attending Swampscott, Swampscott had provided G.D. with a FAPE.

D. 49-1 at 5. Plaintiffs rely upon the Supreme Court's decision in <u>Endrew F.</u> to support their contention that "slow gains" are inadequate under the IDEA. D. 49-1 at 6 (citing <u>Endrew F.</u>, 137 S. Ct. at 997). <u>Endrew F.</u>, however, does not support the conclusion that the Hearing Officer's determination that G.D. made "slow gains" was insufficient to conclude that the IEPs were appropriate.

In <u>Endrew F.</u>, a child with autism attended a public school from preschool through the fourth grade, until his parents unilaterally removed him to a private school. 137 S. Ct. at 996. The goals in the student's IEPs were essentially unchanged from year to year, which indicated that he was not making progress each year. <u>Id.</u> The parents sought reimbursement for the student's placement in private school and the Tenth Circuit ruled in favor of the school district, stating that "a child's IEP is adequate as long as it is calculated to confer an 'educational benefit [that is] merely . . . more than *de minimis*.'" <u>Id.</u> at 997 (alteration in original). The Supreme Court disagreed, finding that the "more than *de minimus*" standard was insufficient and, without setting specific requirements, explained that IDEA requires "an educational program reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." <u>Id.</u> at 1001. The Court stated that "[t]he goals may differ [for each student], but every child should have the chance to meet challenging objectives." <u>Id.</u> at 1000.

Here, the Hearing Officer concluded that the goals included in the IEPs for G.D. and the progress that G.D. made towards achieving those goals were appropriate in light of G.D.'s circumstances. <u>See</u> AR at 229. In considering that G.D. made "slow gains" towards achieving the goals in the various IEPs prepared for G.D. throughout the school year, the Hearing Officer noted that, through observations, informal or curriculum-based assessments, work samples and assessments of progress in various learning programs, G.D. acquired "some phonemic awareness

9

skills through LiPS instruction, progressed from being unable to blend syllables or recognize vowels, to being able to identify some syllable types and digraphs, and from being able to read only at a mid-kindergarten level when she entered [Swampscott] in August 2017 to being able to read a Grade 1-level text by January 2018 . . . [and] acquired knowledge of word sounds and recognized increasing numbers of sight words." AR at 227-28. Such evidence of G.D.'s progress while at Swampscott supports the conclusion that Swampscott offered G.D. a FAPE. See Walsh v. Silver Lake Reg'l Sch. Dist., No.18-cv-12576-PBS, 2020 WL 767392, at *9 (D. Mass. Jan. 21, 2020) (stating that "[e]vidence of progress can support the conclusion that an IEP provides a FAPE") (citing Lessard v. Wilton Lyndeborough Coop. Sch. Dist., 518 F.3d 18, 29 (1st Cir. 2008)).

The record indicates that the Hearing Officer also took into consideration G.D.'s specific circumstances as required under Endrew F., noting that G.D. had attended kindergarten and first grade without any special education services and indicating that there was no evidence as to how this lack of services would have affected G.D.'s "rate of progress" while at Swampscott. AR at 228; see Endrew F., 137 S. Ct. at 1001. Although the Hearing Officer noted that this was a "close case," AR at 229, this does not lead to the conclusion that, after considering all the factors relevant to G.D., the result was incorrect. A "reviewing judge is to accord the administrative proceedings 'due weight' and 'is not at liberty either to turn a blind eye to administrative findings or to discard them without sound reason.'" Manchester-Essex Reg'l Sch. Dist. Sch. Comm. v. Bureau of Special Educ. Appeals of Massachusetts Dep't of Educ., No. 05-cv-10922-NMG, 2006 WL 8458360, at *4 (D. Mass. Sept. 27, 2006) (quoting Lenn, 998 F.2d at 1086).

At the hearing and in support of this motion, Plaintiffs rely heavily upon the opinions and evaluations of Dr. Kemper and his conclusion that G.D. made no "statistically significant" progress

as measured by formal assessments and standardized tests. See AR at 228; D. 49-1 at 8. Plaintiffs, however, point to no cases in support of their argument that a child's progress only must be measurable through standardized testing to be considered appropriate. See Morrison v. Perry Sch. Dep't, No. 18-cv-00106-DBH, 2019 WL 3035283, at *6-7 (D. Me. July 11, 2019) (stating that an absence of "demonstrable improvement in academic test scores" is not, in itself, an indication of denial of FAPE because "FAPE assessment is based on the entire academic record"). The Hearing Officer noted the lack of statistical indicators of progress and stated that "there is no credible, reliable information in the record about how much growth in standardized test scores during the time period in question would be required to demonstrate 'effective progress' for [G.D.]." AR at 228. Rather, as the Hearing Officer noted, "the overwhelming weight of the evidence is that Swampscott developed five successive IEPs that responded to Student's special needs, increasing services as the extent of those needs became clearer." AR at 227. The Hearing Officer also, although crediting Dr. Kemper's "objective evaluation results," did not credit his assessment that the only appropriate placement for G.D. was at a private school where Dr. Kemper formulated this opinion before G.D. entered Swampscott and began receiving services. See AR at 229. The Hearing Officer noted that this opinion appeared to "reflect [Dr. Kemper's] general education philosophy rather than an analysis of how [Swampscott] was or was not meeting [G.D.'s] unique needs." AR at 229. "Credibility determinations are the province of the factfinder," Sudbury Pub. Sch. v. Mass. Dep't of Elem. & Secondary Educ., 762 F. Supp. 2d 254, 262 (D. Mass. 2010), and the Court has no reason to question the Hearing Officer's determinations. See Cranston Sch. Dist. v. Q.D., No. C.A. 06-538ML, 2008 WL 4145980, at *9 (D.R.I. Sept. 8, 2008) (stating that "[a]s the fact-finder, [the Hearing Officer's] credibility findings from the Hearing should be given deference") (citing Lenn, 998 F.2d at 1087).

The party challenging a Hearing Officer's decision bears the burden of proof, Natick Pub. Sch. Dist., 2017 WL 3122654, at *1, and Plaintiffs have failed to show that the Hearing Officer's determination that G.D.'s progress was appropriate in light of her circumstances was improper. That G.D. made "slow gains" does not indicate that her progress was little more than *de minimis*, particularly where the Hearing Officer noted that G.D. made progress in reaching the goals in her IEP.  AR at 221, 229.  In Johnson v. Boston Pub. Schs, 906 F.3d 182 (1st Cir. 2018), the First Circuit concluded that a BSEA hearing officer's finding that a student made "slow" progress did not, in and of itself, indicate that a student was denied a "meaningful educational benefit" as required under IDEA.  Johnson, 906 F.3d at 196.  Rather, "the relationship between speed of advancement and the educational benefit must be viewed in light of a child's individual circumstances."  Id. (quoting Endrew F., 137 S. Ct. at 1001).  As discussed above, the Hearing Officer properly took into consideration G.D.'s individual circumstances in determining that, even though she made "slow gains," the IEPs provided a FAPE.  "[O]n matters that implicate educational expertise, heightened deference is due to an agency's administrative findings." Natick Pub. Sch. Dist., 2017 WL 3122654, at *15; see Walsh, 2020 WL 767392, at *12 (stating that "deference is owed to the educators who, by statute, have the primary responsibility of designing the student's education") (citing Endrew F., 137 S. Ct. at 1001-02).  Having determined that the Hearing Officer appropriately applied the law, the Court concludes that the officer's judgment with respect to the adequacy of the IEPs relevant to G.D.'s personal circumstances was not erroneous.

### C. G.D.'s Progress at Landmark Does Not Indicate that Swampscott Failed to Provide a FAPE to G.D.

As previously noted, this Court granted Plaintiff's motion to supplement the record in part to the extent that they were permitted to submit documents supporting G.D.'s progress at Landmark during the 2018 summer program and the 2018-19 school year up through October 10,

2018, which was the last date of the administrative hearing. D. 37. This allowed Plaintiffs to submit documents available at the time of the administrative hearing before the BSEA Hearing Officer, but it remains the case that the proper lens is for what information was available to Swampscott in its consideration of the appropriate IEPs for G.D. See Richmond Consol. Sch. Dist., 2016 WL 3064056, at *5 (noting that "[t]he adequacy of [an] IEP must be examined based on what was known to the school district when the IEP was promulgated"); Natick Pub. Sch. Dist., 2017 WL 3122654, at *15 (clarifying that "[a]n IEP is a snapshot, not a retrospective" and that "[i]n striving for 'appropriateness,' an IEP must take into account what was, and was not, objectively reasonable when the snapshot was taken, that is, at the time the IEP was promulgated") (quoting Roland M. v. Concord Sch. Comm., 910 F.2d 983, 992 (1st Cir. 1990)).

Swampscott has filed a motion to strike the supplemental record, arguing that the documents included therein are not authenticated and that the affidavits submitted are repetitive, unsupported, not based on personal knowledge and are wrong or misleading. See D. 56; D. 57 at 1-2. Plaintiffs do not respond to Swampscott's arguments as to the adequacy of the evidence in the supplemental record, but rather argue that Swampscott waived the right to object to the evidence because they stipulated to its submission and that Swampscott's arguments go to the weight of the evidence. See D. 61 at 1-2. As an initial matter, although Swampscott stipulated to Plaintiffs' submission of the supplemental record, they were not agreeing to the relevance, competence or reliability of the evidence included and they retained the right to argue against the weight of such evidence. D. 49-3 at 2. Having granted the motion to supplement the record, however, the Court declines to grant the motion to strike the supplemental record, but notes that the standard rules of evidence apply such that evidence submitted in the supplemental record must be admissible to be considered by the Court. See, e.g., Setterlund v. Potter, 597 F. Supp. 2d 167,

170 (D. Mass. 2008) (noting that "evidence must be admissible at trial in order to be considered on summary judgment"); Goguen v. Textron, Inc., 234 F.R.D. 13, 16 (D. Mass. 2006) (same).

Plaintiffs argue that the evidence in the supplemental record shows that G.D. made "rapid and significant progress" at Landmark, which they argue indicates that Swampscott did not provide appropriate IEPs reasonably calculated to provide G.D. a FAPE. D. 49-1 at 8-10. Much of the evidence in the supplemental record consists of G.D.'s assignments, but it is not authenticated, and the documents are submitted without context. See D. 49-3.

To the extent that any of the evidence in the supplemental record is admissible and could be said to support Plaintiffs' contention that G.D. made progress at Landmark, this does not support the conclusion that the Hearing Officer erred in finding that the IEPs implemented by Swampscott were adequate. "The adequacy of a given IEP turns on the unique circumstances of the child for whom it was created," which "should not be mistaken for 'an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review.'" Endrew, 137 S. Ct. at 1001 (quoting Board of Ed. of Hendrick Hudson Central School Dist., Westchester Cty. v. Rowley, 458 U. S. 176, 206 (1982)). Additionally, "[t]he IDEA mandates a preference for educating students with disabilities in general-education settings" such that "mainstreaming may not be ignored even to fulfill substantive educational criteria." Natick Pub. Sch. Dist., 2018 WL 3510291, at *3 (citing Roland M., 910 F.2d at 993). As such, "the benefits to be gained from mainstreaming must be weighed against the educational improvements that could be attained in a more restrictive (that is, non-mainstream) environment." Id. At Swampscott, G.D. participated in a general education class for certain subjects, whereas the entirety of Landmark's curriculum takes place in a special education environment. See AR 205, 223, 3576-77. In balancing the appropriateness of the educational benefits and the preference for

mainstreaming, the Court cannot conclude that the supplemental record demonstrates the inadequacy of Swampscott's IEPs and G.D.'s progress thereunder.

## VI. Conclusion

For the foregoing reasons, the Court DENIES Swampscott's motion to strike the supplemental record, D. 56, and DENIES Plaintiffs' motion for summary judgment, D. 49. Swampscott did not formally move for summary judgment, but in their opposition asked that this Court affirm the BSEA's decision. D. 58 at 18. As this case was "in substance an appeal from [the BSEA]," there is nothing else for the Court to resolve and judgment in favor of Defendants is warranted. See C.D. v. Natick Pub. Sch. Dist., 2018 U.S. Dist. LEXIS 121315, *10 (D. Mass. 2018); Parents of Danielle v. Mass. Dep't of Educ., 430 F. Supp. 2d 3, 8 (D. Mass. 2006).

**So Ordered.**

/s/ Denise J. Casper
United States District Judge